**LOWENSTEIN SANDLER LLP**
JEFFREY D. PROL (admitted *pro hac vice*)
jprol@lowenstein.com
MICHAEL KAPLAN (admitted *pro hac vice*)
mkaplan@lowenstein.com
BRENT WEISENBERG (admitted *pro hac vice*)
bweisenberg@lowenstein.com
COLLEEN M. RESTEL (admitted *pro hac vice*)
crestel@lowenstein.com
One Lowenstein Drive
Roseland, New Jersey 07068
Telephone: (973) 597-2500
Facsimile: (973) 597-2400

**KELLER BENVENUTTI KIM LLP**
TOBIAS S. KELLER (Cal. Bar No. 151445)
tkeller@kbkllp.com
JANE KIM (Cal. Bar No. 298192)
jkim@kbkllp.com
GABRIELLE L. ALBERT (Cal. Bar No. 190895)
galbert@kbkllp.com
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone: (415) 496-6723
Facsimile: (650) 636-9251

*Counsel to the Official Committee of Unsecured Creditors*

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

|  |  |
|---|---|
| *In re:* | ) |
|  | ) |
| THE ROMAN CATHOLIC BISHOP | ) Case No. 23-40523 WJL |
| OF OAKLAND, a California | ) |
| corporation sole, | ) Chapter 11 |
|  | ) |
| Debtor. | ) |
| --------------------------------------------- | ) |
|  | ) Adv. Pro. 24-04053 WJL |
| THE OFFICIAL COMMITTEE OF | ) |
| UNSECURED CREDITORS OF THE | ) |
| ROMAN CATHOLIC BISHOP OF | ) |
| OAKLAND, | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) |
|  | ) |
| THE ROMAN CATHOLIC BISHOP | ) |
| OF OAKLAND, ADVENTUS, THE | ) |
| ROMAN CATHOLIC WELFARE | ) |

CORPORATION OF OAKLAND,
AND THE ROMAN CATHOLIC
CEMETERIES OF THE DIOCESE
OF OAKLAND,

          Defendants.

)
)
)
)
)
)
)
)

## FIRST AMENDED ADVERSARY COMPLAINT

Plaintiff, the Official Committee of Unsecured Creditors (the "**Committee**") in the chapter 11 bankruptcy case (the "**Chapter 11 Case**") of the Roman Catholic Bishop of Oakland (the "**Debtor**"), files this amended adversary complaint (this "**Complaint**") against (i) the Debtor, (ii) Adventus, (iii) the Roman Catholic Welfare Corporation of Oakland ("**RCWC**") and (iv) the Roman Catholic Cemeteries of the Diocese of Oakland ("**RCC**" and together with Adventus and RCWC, the "**Non-Debtor Affiliated Entities**"), and hereby alleges as follows:

### I.

### PRELIMINARY STATEMENT[1]

1. The Debtor contends that the Non-Debtor Affiliated Entities are distinct from the Debtor such that their assets are not available to pay claims held by Survivors. But the Debtor and each of the Non-Debtor Affiliated Entities are, in effect, one entity. Treating the Debtor and the Non-Debtor Affiliated Entities as separate corporations serves only to shelter hundreds of millions of dollars in assets, including real property, cash and investments (collectively, the "**Property**"), from the Debtor's estate and its creditors.

2. The facts set forth herein support the substantive consolidation of the Debtor with each of the Non-Debtor Affiliated Entities, because, for each of the Non-Debtor Affiliated Entities, (i) the entanglement test and/or creditor expectations test has been satisfied and (ii) the benefit to creditors outweighs any potential harm to each of the Non-Debtor Affiliated Entities should they be substantively consolidated with the Debtor.

---

[1] Capitalized terms used but not defined in this Preliminary Statement have the meanings ascribed to them in this Complaint.

2

3.     Regardless of whether the Debtor and Non-Debtor Affiliated Entities are determined to be legally distinct entities, under California law the Debtor is the equitable owner of ███████████ of RCWC's funds held at the Oakland Parochial Fund (the "**OPF**") (along with any other funds and/ or loans transferred by the Debtor to the OPF on behalf of RCWC, the "**School Funds**"), such that those funds belong to the Debtor.  Accordingly, the Committee seeks a declaration that the School Funds are property of the Debtor's bankruptcy estate under Section 541 of chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").

## II.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction over this adversary proceeding under 28 U.S.C. §§ 157 and 1334(b), Section 105 of the Bankruptcy Code and Federal Rules of Bankruptcy Procedure 7001 and 7013.

5.     Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409, as this adversary proceeding arises under and in connection with a case under chapter 11 of the Bankruptcy Code that is pending in this District.

6.     This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O).

## III.

## PARTIES

7.     Plaintiff is the Official Committee of Unsecured Creditors appointed in the Chapter 11 Case by the Office of the United States Trustee under Section 1102(a) of the Bankruptcy Code.

8.     The Committee is a party in interest in the Chapter 11 Case under Section 1109(b) of the Bankruptcy Code.

9.     The Committee is comprised of nine survivors of sexual abuse asserting claims against the Debtor arising out of sexual abuse perpetrated by persons or entities associated with or representing the Debtor (the "**Survivors**").

3

10.     Defendant, the Debtor in the Chapter 11 Case, is incorporated under California law as a "corporation sole."

11.     The Debtor's principal place of business is located at 2121 Harrison Street, Suite 100, Oakland, California 94612.

12.     Defendant RCWC is a nonprofit religious corporation that oversees 32 elementary schools and two high schools within the Diocese (defined below).

13.     RCWC's principal place of business is located at 2121 Harrison Street, Suite 100, Oakland, California 94612.

14.     Defendant RCC (d/b/a Catholic Funeral and Cemetery Services) is a California corporation that operates and administers six diocesan cemeteries, five diocesan mortuaries, two mausoleums and one crematory on land owned by the Debtor.

15.     RCC's principal place of business is located at 2121 Harrison Street, Suite 100, Oakland, California 94612.

16.     Defendant Adventus is a California corporation used by the Debtor to hold title to certain single-family residences in Byron and Hayward, California and undeveloped land in Livermore, California.

17.     Adventus' principal place of business is located at 2121 Harrison Street, Suite 100, Oakland, California 94612.

## IV.

## FACTUAL ALLEGATIONS

### A.     The Diocesan Enterprise

18.     The Diocese of Oakland (the "**Diocese**") is the territorial division of the Roman Catholic Church in the counties of Alameda and Contra Costa, California.

19.     The Diocese is controlled, operated and acts through the bishop of the Diocese (the "**Bishop**").

20.     The Bishop incorporated the Debtor as a corporation sole to administer and manage the affairs, property and temporalities of the Diocese under California civil law.

4

21. The Diocese consists of what the Debtor has described as "components:" the Central Services Administration of the Diocese (the "**Chancery**"), which is an administrative unit of the Debtor; the school activities of RCWC; the cemetery and mortuary activities of RCC and the activities and assets of Adventus, the Diocesan entity that administers certain real estate holdings and transactions.

22. The Bishop acts through the Debtor, RCC, RCWC and Adventus.

23. The Debtor and each of the Non-Debtor Affiliated Entities share the same business and mailing address at 2121 Harrison Street, Suite 100 Oakland, California 94612.

24. The Bishop appoints, either directly or indirectly, the directors of each of the Non-Debtor Affiliates.

25. The Debtor and the Non-Debtor Affiliated Entities share or have shared the following officers and directors, with potentially conflicting duties of loyalty.

    (i)     Paul Bongiovanni served as CFO and agent for service of process of the Debtor from at least 2017 through and until his retirement on March 31, 2024; president and CEO of Adventus from 2019–2021; CFO of Adventus in 2019; agent for service of process for Adventus in 2019 and 2021; CFO, secretary, and agent for service of process for RCWC from 2020–2022; CFO of RCC in 2019 and from 2023–2024; and secretary of RCC from 2023–2024.

    (ii)     Michael Canizzaro served as attorney-in-fact for the Debtor in 2007; vice president of Adventus in 2007; Secretary and assistant treasurer of RCWC in 2007; and secretary and treasurer of RCC in 2007.

    (iii)     John S. Cummins served as Bishop of the Debtor from 1977–2003; president and CEO, CFO, Secretary, and agent for service of process for the Debtor from 1999–2002; director of RCWC in 1962; and president of RCWC in 1979.

    (iv)     Floyd L. Begin served as Bishop of the Debtor from 1962–1977; director of RCWC in 1962; and president and CEO of RCWC in 1967.

26. The Debtor maintains a website that provides a single online source containing Non-Debtor Affiliated Entity-related resources and reflecting those entities as component parts of the Diocesan enterprise: the "Diocese" tab of the Debtor's website includes a "Diocesan Directory" with a link providing access to (i) a RCC/Catholic Funeral and Cemetery Services webpage that includes information on services, locations, mission programs, key contacts, and

Case: 24-04053    Doc# 32    Filed: 05/06/25    Entered: 05/06/25 16:35:20    Page 5 of 25

FAQs, and (ii) information on diocesan schools, including a "school finder" with locations of all Diocesan schools, in addition to a direct link to the "Catholic Schools Diocese of Oakland."

### (i) The Chancery

27.     All administrative functions within the Diocese are centered in the Chancery.

28.     The Chancery oversees all accounting, business development and strategic planning, human resources, information systems, property management services, education services and overall operations within the Diocese, including the operations of the Non-Debtor Affiliated Entities.

29.     As of the date the Chapter 11 Case was commenced, the Debtor employed approximately 30 full-time and 42 part-time Chancery employees.

30.     The Chancery provides financial support to certain Diocesan entities, institutions, and associations, including Adventus and RCWC.

### (ii) RCWC

31.     According to the Debtor's website, "including religious education programs, there are over 45,000 students under Catholic instruction in the Diocese at 41 elementary schools, 8 high schools, two Catholic colleges and several schools of religious formation [(the "**Schools**")]."

32.     RCWC's Bylaws specify that "[f]our (4) of the directors . . . shall be appointed by "The Roman Catholic Bishop of Oakland, a corporation sole" and the remaining "[t]hree (3) directors . . . shall be elected by the Appointed Directors."

33.     All capital expenditures of Diocesan schools that exceed $50,000 must be reviewed by (i) a group of eight Diocesan consultors, each of which is appointed by the Bishop for a five-year term (the "**College of Consultors**"); and (ii) the Debtor's chief financial officer.

34.     Following the review described in paragraph 33 herein, all capital expenditures of the Diocesan schools that exceed $50,000 must be submitted to the Bishop for final approval.

**(iii)** **RCC**

36. RCC operates and administers all cemetery, mausoleum and mortuary services in the Diocese.

37. RCC operates and administers six diocesan cemeteries, five diocesan mortuaries, two mausoleums and one crematory.

38. All real property necessary to carry out RCC's activities is leased from the Debtor through ground leases or other lease forms.

39. While RCC owns improvements erected on the Debtor's real property, RCC owns no land itself.

40. The Debtor selects each director on RCC's board of directors.

---

2    The book value of real property and other fixed assets does not represent the fair market value of such property. Instead, book value reflects historical cost, less depreciation recognized for accounting purposes.

**(iv)    Adventus**

42.    Adventus is a corporation used by the Diocese to hold title to certain parcels of real property, including certain single-family residences in Byron and Hayward, California, and undeveloped land in Livermore, California.

43.    The Debtor selects each director on Adventus's board of directors.

44.    Adventus's financials are consolidated into those of the Debtor.

46.    The Debtor estimates that the value of the property Adventus owns in Livermore, California is between $43 and $81 million dollars or more.

**B.    Diocese Governance**

47.    The Bishop is currently the Most Reverend Michael C. Barber, SJ, who has served in that role since May 25, 2013.

48.    All Catholic clergy within the Diocese report directly to the Bishop.

49.    The Bishop is responsible for all personnel decisions within the Diocese, including, but not limited to, personnel decisions within each of the Non-Debtor Affiliated Entities.

50.    The Bishop is charged with the collection of revenues earned or donated within the parishes to fund the activities and obligations of the Diocese, including, but not limited to, funding the activities and obligations of the Non-Debtor Affiliated Entities.

51.    The Bishop is charged with the review and approval of the Diocesan budget and investments, as well as the review of, and advice on, parish and RCWC budgets, as well as any budgets adopted by Adventus and RCC.

52.    The Bishop is charged with setting all policies for the mission of the Roman Catholic Church within the Diocese.

8

53.     The Bishop appoints each of the principal staff members of the Diocese, including the principal staff members of the Non-Debtor Affiliated Entities.

54.     Except for certain transactions that require approval of the Pope, the Bishop has authority to exercise control over all assets within his Diocese, including the Property purportedly owned by the Non-Debtor Affiliated Entities.

**C.      <u>The Series 2007 Bond Offering</u>**



Case: 24-04053   Doc# 32   Filed: 05/06/25   Entered: 05/06/25 16:35:20   Page 10 of 25

**D. Diocesan-Wide Fundraising Campaign**

67.     In or around 2015, the Bishop launched a Diocesan-wide fundraising campaign to address significant financial needs, including a $30 million debt restructure related to the Series 2007 Bonds.

68.     The campaign aimed to raise $65 million to support various Diocesan initiatives, including the "Bishop's Appeal."

69.     According to a stewardship and accountability report, $3 million raised through the "Bishop's Appeal" 2015 campaign provided unrestricted funds to pay the budgeted expenses of the Debtor, as well as "any amounts payable on debt of the Diocese, including the [Series 2007] Bonds."[3]

**E. The Deposit and Loan Fund**

70.     Before April 2023, the Debtor held and managed certain deposits and investments on behalf of itself, Diocesan churches, and RCWC, through two programs: (i) the Deposit and Loan Fund (the "**DLF**"), and (ii) the Investment/Endowment Pool (the

---

[3]     In the *Third Amended Disclosure Statement for the Debtor's Third Amended Plan*, the Debtor asserts that the funds in the Bishop's Appeal are restricted funds.

"**Endowment Pool**" and collectively with the DLF, the "**Diocesan Investment Management Services**").

71.     The DLF was an internal savings and loan program controlled and operated by the Debtor which required the Non-Debtor Affiliated Entities (among others) to deposit their excess funds for the benefit of participating churches, the Schools, and cemeteries within the Diocese.

72.     Before April 2023, all DLF and Endowment Pool bank and investment accounts were titled in the name of the Debtor.

73.     Before April 2023, the Debtor exercised control over the DLF and Endowment Pool bank and investment accounts.

74.     Through the DLF, RCWC, among others, separately invested funds with long-term investment goals in marketable securities through the Diocesan Investment Management Services.

75.     The Debtor loaned the funds deposited in the DLF to Diocesan parishes, the Schools, and other Diocesan entities, to finance their construction of capital improvements projects and then paid the depositors a stated interest rate.

76.     RCWC's consent was not required to use its funds as loans to Diocesan parishes, the Schools, and other Diocesan entities.

77.     The Non-Debtor Affiliated Entities' funds in the DLF (which funds were transferred to The Oakland Parochial Fund before the Debtor's bankruptcy filing) were, upon information and belief, historically commingled.

78.     As part of the DLF program, cash deposits and investments of the Debtor, as well as cash deposited by Diocesan churches and RCWC schools were held in a general operating checking account (the "**Deposit Account**").

79.     The Deposit Account in the DLF program was a demand deposit account used for the short-term liquidity needs of the Debtor, the Diocesan churches and RCWC.

12

80.     The Deposit Account held cash that the Debtor, the Diocesan churches, and RCWC schools could use for general operations and short-term needs, or to cover short-term operating cash flow shortfalls.

81.     Certain of the funds in the DLF were invested and held in an investment account (the "**Investment Account**").

82.     The Endowment Pool was maintained at, and accounted for, by the custodian for the Investment Account.

83.     As part of the Endowment Pool, funds of the Debtor, the Diocesan churches, and the Schools were held at such custodian for purposes of longer-term investments.

84.     The Diocesan churches and the Schools lacked control over how these funds were invested.

F.      **The Debtor Transfers the School Funds to the OPF**

85.     In or about April and May, 2023, the Debtor transferred approximately $106 million to the OPF (the "**OPF Transfer**").

88.     RCWC is not a party or a signatory to the agreements described in the preceding paragraph.

89.     RCWC did not authorize or approve the OPF Transfer.

(i)     **Parochial Fund Agreement**



Case: 24-04053   Doc# 32   Filed: 05/06/25   Entered: 05/06/25 16:35:20   Page 14 of 25

### G.  2017 PNC Credit and Security Agreement

110.    All members of the Bond Obligated Group entered into that certain Credit and Security Agreement with PNC (f/k/a Compass Bank), as lender, dated as of February 1, 2017 (the "**2017 Credit and Security Agreement**"), under which the Debtor borrowed $70 million for funding the redemption of the outstanding Series 2007 Bonds (the "**PNC Bank Debt**").

111.    All members of the Bond Obligated Group served as guarantors under the 2017 Credit and Security Agreement.

112.    The 2017 Credit and Security Agreement contains a "Covenant to Obtain Assets," which allows the Debtor to take certain actions to avoid or cure an event of default caused by the Bond Obligated Group's inability to make timely payments (in addition to other means of raising income that may be legally available), including: (i) using, controlling, and disposing of the assets of those public juridic persons subject to his governance; (ii) increasing the customary rate of the cathedraticum on all or substantially all of the public juridic persons subject to his governance; (iii) imposing an extraordinary and moderate exaction upon other physical and juridic persons; (iv) increasing prescribed fees and suggested free-will offerings; and (v) instituting a diocesan-wide extraordinary appeal

## V.

## CAUSES OF ACTION

## COUNT ONE

### Substantive Consolidation of the Debtor and RCWC
### (Against the Debtor and RCWC)

113.   The Committee repeats and realleges each of the allegations set forth in the paragraphs above, and each of the paragraphs below, as if fully set forth herein.

114.   To sustain a claim for substantive consolidation in the Ninth Circuit, a movant must first show either that (i) the affairs of the entity a movant seeks to substantively consolidate with a debtor, and the debtor, are so entangled that consolidation will benefit all creditors (the "**entanglement test**") or (ii) creditors dealt with the entities as a single economic unit and did not rely on their separate identity in extending credit (the "**creditor expectations test**").

115.   To sustain a claim for substantive consolidation in the Ninth Circuit, a movant must also show that the benefit of substantive consolidation to the creditors of the targeted entities outweighs the harm (if any) to the entity or entities being consolidated.

116.   The Ninth Circuit has determined that the entanglement test is satisfied by a showing of the traditional alter ego factors under California state law.

117.   California's alter ego doctrine requires (i) a unity of interest and ownership between the subject entities so that the separate personalities of the corporations no longer exist and (ii) that injustice will result from a failure to disregard purported corporate formalities.

118.   Numerous factors, none of which are determinative, are considered when determining whether a unity of interest and ownership exists under the California alter ego doctrine.

119.   Unity of interest and ownership exists under California law when many factors are found, and no particular factor, or number of factors, is required.

16

120. Numerous factors recognized under California law as traditional alter ego factors are satisfied based on the facts alleged herein, including, but not limited to, the following:

(i)    <u>Failure to maintain arm's length relationships among related entities</u>:

- The Debtor selects each director on RCWC's board of directors.

- The Bishop appoints each of the principal staff members of RCWC.

- The Debtor orchestrated the OPF Transfer, and the PFA, the IAA and the MSA.

- The School Funds are invested at the direction of the Debtor and the Debtor must approve financing for RCWC under the MSA, even though RCWC is not a party or a signatory to the MSA.

- RCWC does not follow proper corporate formalities in making decisions.

- The Bishop does not respect the RCWC corporate form when making decisions for the components which comprise his Diocese, which includes RCWC.

- All capital expenditures of RCEC's Schools that exceed $50,000 must be submitted to the Bishop for final approval.

(ii)    <u>Shared officers and/or directors</u>: (i) Paul Bongiovanni served as CFO of the Debtor from at least 2017 through and until his retirement on March 31, 2024; and he also served as CFO, secretary, and agent of process for RCWC from at least 2020 through 2022; (ii) Michael Canizzaro served as attorney-in-fact for the Debtor in 2007, and he also served as the secretary and assistant treasurer of RCWC in 2007; (iii) John S. Cummins served as Bishop from 1977 through 2003, the Debtor's president, CEO, CFO, secretary and agent of service from 1999 through 2002, and director of RCWC in 1962, and CEO of RCWC in 1979; and (iv) Floyd L. Begin served as Bishop from 1692 through 1977, and served as director of RCWC in 1962, and president and CEO of RCWC in 1967.

(iii)    <u>Using the same office or business location</u>: The Debtor and RCWC share the same business and mailing address at 2121 Harrison Street, Suite 100 Oakland, California 94612.

(iv)    <u>Using shared employees</u>: The Chancery and its employees handle administrative functions for both the Debtor and RCWC. Except for certain transactions that require approval of the Pope, the Bishop has authority to exercise control over all assets within his Diocese, including the Property purportedly owned by RCWC.

(v)    <u>Commingling of funds or other assets</u>: RCWC's funds in the DLF were historically commingled with assets of the Debtor and other Non-Debtor Affiliated Entities.

17



121.    Due to those facts, among other facts set forth in this Complaint and incorporated herein, the affairs of RCWC and the Debtor are so entangled that consolidation will benefit all creditors, thus satisfying the entanglement test.

122.    In addition, as set forth in more detail in paragraphs 55 through 66, and 110 through 112, creditors dealt with the Debtor and RCWC as a single economic unit and did not rely on their separate identity in extending credit.



125.    Injustice will result from a failure to disregard the purported corporate formalities between RCWC and the Debtor, and the benefits of substantive consolidation to creditors outweighs any purported harm to RCWC because (i) the Debtor is attempting to use the Chapter 11 Case to obtain a litigation advantage over the Survivors by placing the Property beyond their reach but still within the Debtor's reach and control, and (ii) substantive

Case: 24-04053    Doc# 32    Filed: 05/06/25    Entered: 05/06/25 16:35:20    Page 18 of 25

consolidation is necessary to ensure fairness to all creditors, as it would, among other things, substantially increase the pool of assets available to pay Survivors.

126. Accordingly, the Debtor and RCWC should be substantively consolidated because: (i) the entanglement test and/or the creditor expectations test is satisfied, and (ii) the benefits of substantive consolidation to creditors outweigh any potential harm to RCWC should RCWC be substantively consolidated.

## COUNT TWO

### Substantive Consolidation of the Debtor and RCC
### (Against the Debtor and RCC)

127. The Committee repeats and realleges each of the allegations set forth in the paragraphs above, and each of the paragraphs below, as if fully set forth herein.

128. To sustain a claim for substantive consolidation in the Ninth Circuit, a movant must satisfy either (i) the entanglement test; or (ii) the creditor expectations test.

129. To sustain a claim for substantive consolidation in the Ninth Circuit, a movant must also show that the benefit of substantive consolidation to the creditors of the targeted entities outweighs the harm (if any) to the entity or entities being consolidated.

130. The Ninth Circuit has determined that the entanglement test is satisfied by a showing of the traditional alter ego factors under California state law. California's alter ego doctrine requires (i) a unity of interest and ownership between the subject entities so that the separate personalities of the corporations no longer exist, and (ii) that injustice will result from a failure to disregard purported corporate formalities.

131. Numerous factors, none of which are determinative, are considered when determining whether a unity of interest and ownership exists under the California alter ego doctrine. Unity of interest and ownership exists under California law when many factors are found, and no particular factor, or number of factors, is required. Numerous factors recognized under California law as traditional alter ego factors are satisfied based on the facts alleged herein, including, but not limited to, the following:

19

(i)    <u>Failure to maintain arm's length relationships among related entities</u>:

- The Debtor appoints each of RCC's directors.

- The Bishop appoints each of the principal staff members RCC.

- RCC does not follow proper corporate formalities in making decisions.

- The Bishop does not respect the RCC corporate form when making decisions for the components which comprise his Diocese, which includes RCWC.

(ii)    <u>Shared officers and/or directors</u>: (i) Paul Bongiovanni served as CFO of the Debtor from at least 2017 through and until his retirement on March 31, 2024; and he also served as CFO of RCC in 2019 and from 2023 to 2024, and as secretary of RCC from 2023 to 2024; and (ii) Michael Canizzaro served as attorney-in-fact for the Debtor in 2007, and the secretary and treasurer of RCC in 2007.

(iii)    <u>Using the same office or business location</u>: The Debtor and RCC share the same business and mailing address at 2121 Harrison Street, Suite 100 Oakland, California 94612.

(iv)    <u>Using shared employees</u>: The Chancery and its employees handle administrative functions for both the Debtor and RCC. Except for certain transactions that require approval of the Pope, the Bishop has authority to exercise control over all assets within his Diocese, including the Property purportedly owned by RCC.

(v)    <u>Commingling of funds or other assets</u>: RCC funds in the DLF were historically commingled with assets of the Debtor and other Non-Debtor Affiliated Entities.

[text redacted]

132.    Due to those facts, along with other facts set forth in this Complaint and incorporated herein, the affairs of RCC and the Debtor are so entangled that consolidation will benefit all creditors, thus satisfying the entanglement test.

135. Injustice will result from a failure to disregard the purported corporate formalities between RCC and the Debtor, and the benefits of substantive consolidation to creditors outweighs any purported harm to RCC because (i) the Debtor is attempting to use the Chapter 11 Case to obtain a litigation advantage over the Survivors by placing the Property beyond their reach but still within the Debtor's reach and control, and (ii) substantive consolidation is necessary to ensure fairness to all creditors, as it would, among other things, substantially increase the pool of assets available to pay Survivors.

136. Accordingly, the Debtor and RCC should be substantively consolidated because: (i) the entanglement test and/or the creditor expectations test is satisfied, and (ii) the benefits of substantive consolidation to creditors outweigh any potential harm to RCC should RCC be substantively consolidated.

## COUNT THREE

### Substantive Consolidation of the Debtor and Adventus
### (Against the Debtor and Adventus)

137. The Committee repeats and realleges each of the allegations set forth in the paragraphs above, and each of the paragraphs below, as if fully set forth herein.

138. To sustain a claim for substantive consolidation in the Ninth Circuit, a movant must satisfy either (i) the entanglement test; or (ii) the creditor expectations test.

139. To sustain a claim for substantive consolidation in the Ninth Circuit, a movant must also show that the benefit of substantive consolidation to the creditors of the targeted entities outweighs the harm (if any) to the entity or entities being consolidated.

140. The Ninth Circuit has determined that the entanglement test is satisfied by a showing of the traditional alter ego factors under California state law. California's alter ego doctrine requires (i) a unity of interest and ownership between the subject entities so that the separate personalities of the corporations no longer exist, and (ii) that injustice will result from a failure to disregard purported corporate formalities.

141. Numerous factors, none of which are determinative, are considered when determining whether a unity of interest and ownership exists under the California alter ego doctrine. Unity of interest and ownership exists under California law when many factors are found, and no particular factor, or number of factors, is required. Numerous factors recognized under California law as traditional alter ego factors are satisfied based on the facts alleged herein, including, but not limited to, the following:

(i) <u>Failure to maintain arm's length relationships among related entities</u>:

- The Debtor appoints each of Adventus's directors.

- The Bishop appoints each of the principal staff members of Adventus.

- Adventus does not follow proper corporate formalities in making decisions.

- The Bishop does not respect the Adventus corporate form when making decisions for the components which comprise his Diocese, which includes Adventus.

(ii) <u>Shared officers and/or directors</u>: (i) Paul Bongiovanni served as CFO of the Debtor from at least 2017 through and until his retirement on March 31, 2024; and he also served as president and CEO of Adventus from 2019 through 2021, and CFO of Adventus is 2019, as well as agent for service of process for Adventus in 2019 and 2021; and (ii) Michael Canizzaro served as attorney-in-fact for the Debtor in 2007, and vice president of Adventus in 2007.

(iii) <u>Using the same office or business location</u>: The Debtor and Adventus share the same business and mailing address at 2121 Harrison Street, Suite 100 Oakland, California 94612.

(iv)  Using shared employees: The Chancery and its employees handle administrative functions for both the Debtor and Adventus.  Except for certain transactions that require approval of the Pope, the Bishop has authority to exercise control over all assets within his Diocese, including the Property purportedly owned by Adventus.



142.  Due to those facts, along with other facts set forth in this Complaint and incorporated herein, the affairs of Adventus and the Debtor are so entangled that consolidation will benefit all creditors, thus satisfying the entanglement test.

144.  Injustice will result from a failure to disregard the purported corporate formalities between Adventus and the Debtor, and the benefits of substantive consolidation to creditors outweighs any purported harm to Adventus because (i) the Debtor is attempting to use the Chapter 11 Case to obtain a litigation advantage over the Survivors by placing the Property beyond their reach but still within the Debtor's reach and control, and (ii) substantive

23

consolidation is necessary to ensure fairness to all creditors, as it would, among other things, substantially increase the pool of assets available to pay Survivors.

145.     Accordingly, the Debtor and Adventus should be substantively consolidated because: (i) the entanglement test and/or the creditor expectations test is satisfied, and (ii) the benefits of substantive consolidation to creditors outweigh any potential harm to Adventus should Adventus be substantively consolidated.

## COUNT FOUR

**Declaratory Relief: The Debtor is the Equitable Owner of the School Funds**
**(Against the Debtor and RCWC)**

146.     The Committee repeats and realleges each of the allegations set forth in the paragraphs above, as if fully set forth herein.

147.     The Debtor, not RCWC, possessed and controlled the School Funds prior to the OPF Transfer.

148.     In April and May 2023, the Debtor, not RCWC, transferred the School Funds to the OPF without RCWC's consent.

149.     The Debtor, not RCWC, directed the transfer of, and controlled the School Funds as if the School Funds belonged to the Debtor.

150.     The Debtor is the equitable owner of the School Funds under California state law.

151.     Equitable interests belonging to a bankrupt debtor are property of the debtor's estate pursuant to Section 541 of the Bankruptcy Code.

152.     The Debtor exercised control over the School Funds such as if they were its own funds.

153.     The Debtor claims that the School Funds are not property of its estate.

154.     An actual, justiciable controversy exists as to whether the Debtor is the equitable owner of the School Funds under California state law.

155. The Committee is entitled to a determination that the Debtor is the equitable owner of the School Funds such that—by way of Fed. R. Bankr. P. 7001 and/or 28 U.S.C. § 2201(a)—this Court can issue declaratory relief that the School Funds are property of the Debtor's estate under section 541 of the Bankruptcy Code.

## VI.

## **PRAYER FOR RELIEF**

**WHEREFORE**, the Committee seeks judgment as follows:

(i) A determination that each of the Non-Debtor Affiliated Entities should be substantively consolidated with the Debtor's estate *nunc pro tunc* as of the Petition Date;

(ii) A determination that the Debtor owns the School Funds under California state law, such that—by way of Fed. R. Bankr. P. 7001 and/or 28 U.S.C. § 2201(a)—this Court may issue declaratory relief that the School Funds are property of the Debtor's estate under Section 541 of the Bankruptcy Code; and

(iii) Any other relief that the Court deems just and proper.

Dated: May 6, 2025

**KELLER BENVENUTTI KIM LLP**
**LOWENSTEIN SANDLER LLP**

By: */s/ Gabrielle L. Albert*
Tobias S. Keller
Jane Kim
Gabrielle L. Albert

- and -

Jeffrey D. Prol
Michael A. Kaplan
Brent Weisenberg
Colleen M. Restel

*Counsel for the Official Committee of*
*Unsecured Creditors*