1   REBECCA J. WINTHROP (SBN 116386)
    NORTON ROSE FULBRIGHT US LLP
2   555 South Flower Street, Forty-First Floor
    Los Angeles, California  90071
3   Telephone:    (213) 892-9200
    Facsimile:    (213) 892-9494
4   rebecca.winthrop@nortonrosefulbright.com

5   RYAN E. MANNS (*pro hac vice*)
    JAMES V. LEITO (*pro hac vice*)
6   JASON I. BLANCHARD (*pro hac vice*)
    NORTON ROSE FULBRIGHT US LLP
7   2200 Ross Avenue, Suite 3600
    Dallas, Texas 75201
8   Telephone:    (214) 855-8000
    Facsimile:    (214) 855-8200
9   ryan.manns@nortonrosefulbright.com
    james.leito@nortonrosefulbright.com
10  jason.blanchard@nortonrosefulbright.com

11  *Attorneys for Roman Catholic Welfare Corporation of*
    *Oakland, Roman Catholic Cemeteries of the Diocese*
12  *of Oakland, and Adventus*

13                  **UNITED STATES BANKRUPTCY COURT**

14                  **NORTHERN DISTRICT OF CALIFORNIA**

15                          **OAKLAND DIVISION**

16
    In re:                                  Case No. 23-40523 WJL
17
    THE ROMAN CATHOLIC BISHOP OF            Chapter 11
18  OAKLAND, a California corporation sole,

19          Debtor.                         Adv. Pro. No. 24-04053 WJL

20  THE OFFICIAL COMMITTEE OF               **MOTION OF THE ROMAN CATHOLIC**
    UNSECURED CREDITORS OF THE              **WELFARE CORPORATION OF**
21  ROMAN CATHOLIC BISHOP OF                **OAKLAND, THE ROMAN CATHOLIC**
    OAKLAND                                 **CEMETERIES OF THE DIOCESE OF**
22                                          **OAKLAND AND ADVENTUS TO**
            Plaintiff,                      **DISMISS THE OFFICIAL COMMITTEE**
23                                          **OF UNSECURED CREDITORS' FIRST**
    v.                                      **AMENDED COMPLAINT**
24
    THE ROMAN CATHOLIC BISHOP OF            Date:   June 4, 2025
25  OAKLAND, ADVENTUS, THE ROMAN            Time:   10:30 a.m.
    CATHOLIC WELFARE CORPORATION            Judge:  Hon. William J. Lafferty, III
26  OF OAKLAND, AND THE ROMAN               Place:  United States Bankruptcy Court
    CATHOLIC CEMETERIES OF THE                      Courtroom 220
27  DIOCESE OF OAKLAND,                             1300 Clay Street
                                                    Oakland, CA  94612
28          Defendants.

DOCUMENT PREPARED
ON RECYCLED PAPER

TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF THE ROMAN CATHOLIC BISHOP OF OAKLAND:

**PLEASE TAKE NOTICE** that The Roman Catholic Welfare Corporation of Oakland, The Roman Catholic Cemeteries of the Diocese of Oakland, and Adventus (collectively, the "Non-Debtor Defendants"), defendants in the above-captioned adversary proceeding, hereby move this Court (the "Motion"), pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Rules"), as incorporated by Rule 7012 of the Federal Rules of Bankruptcy Procedure, to dismiss the *First Amended Adversary Complaint for Declaratory Relief* (the "Amended Complaint") [Dkt. No. 32] filed against the Non-Debtor Defendants by the Official Committee of Unsecured Creditors of the Roman Catholic Bishop of Oakland (the "Committee"), on the grounds that the Amended Complaint fails to state a claim upon which relief may be granted.

The Motion is based on the attached *Memorandum of Points and Authorities*, the *Declaration of Ryan E. Manns in Support of the Motion of the Roman Catholic Welfare Corporation of Oakland, the Roman Catholic Cemeteries of the Diocese of Oakland and Adventus to Dismiss the Official Committee of Unsecured Creditors' First Amended Complaint* (the "Manns Declaration") and the *Notice of Hearing on the Motion of the Roman Catholic Welfare Corporation of Oakland, the Roman Catholic Cemeteries of the Diocese of Oakland and Adventus to Dismiss the Official Committee of Unsecured Creditors' First Amended Complaint*, both of which are filed concurrently herewith, the records and files in this adversary proceeding and all related proceedings, and such other and further matters as this Court may consider at or before any hearing on this Motion.

Dated: May 23, 2025

REBECCA J. WINTHROP
RYAN E. MANNS (*pro hac vice*)
JASON I. BLANCHARD (*pro hac vice*)
NORTON ROSE FULBRIGHT US LLP


By: */s/ Rebecca J. Winthrop*
   REBECCA J. WINTHROP
   *Attorneys for Roman Catholic Welfare*
   *Corporation of Oakland, Roman Catholic*
   *Cemeteries of the Diocese of Oakland, and*
   *Adventus*

DOCUMENT PREPARED
ON RECYCLED PAPER    redacted

# TABLE OF CONTENTS

Page

I.      PRELIMINARY STATEMENT .............................................................................1

II.     FACTUAL BACKGROUND.................................................................................2

        A.      The Roman Catholic Diocese of Oakland. ...................................... 2

        B.      The Non-Debtor Defendants................................................................ 3

                1.      The Roman Catholic Welfare Corporation of Oakland. ......................... 3

                2.      The Roman Catholic Cemeteries of the Diocese of Oakland. ................ 4

                3.      Adventus. ................................................................................... 4

        C.      The Relationship Between the Debtor and the Non-Debtor Defendants. ......... 5

                1.      Directors and Officers of the Debtor and Non-Debtor Defendants. ........ 5

                2.      The 2007 Bond Issuance. .......................................................... 6

                3.      The 2017 PNC Bank Debt. ........................................................ 8

                4.      The Oakland Parochial Fund Transfer. ....................................... 8

                5.      Other Alleged Connections Between the Debtor and the Non-Debtor Defendants. .................................................................................... 9

III.    LEGAL STANDARD ...........................................................................................10

IV.     ARGUMENT.........................................................................................................11

        A.      The Court Should Dismiss the Committee's Claims for Substantive Consolidation Against the Non-Debtor Defendants Because the Committee Has Not Plausibly Alleged Either Part of the Ninth Circuit's Two-Part Test for Substantive Consolidation (Counts 1, 2, and 3)............................... 12

                1.      The Committee Has Failed to Adequately Allege Creditor Treatment of the Non-Debtor Defendants and Debtor as a Single Economic Unit and Reliance on their Supposed Unity in Extending Credit. ........................ 13

                2.      The Committee Has Not Sufficiently Alleged the Hopeless Entanglement of the Debtor's and Non-Debtor Defendants' Affairs. ... 16

                        a.      No Unity of Interest and Ownership Between the Debtor and Non Debtor Defendants. ..................................................................... 18

                        b.      Fraud or injustice has not been sufficiently alleged. .................... 22

                3.      The Committee Fails to Allege the Harm Posed to the Non-Debtor Defendants by Substantive Consolidation and How that Harm is Supposedly Outweighed by the Benefits of Substantive Consolidation 24

        B.      The Court Should Dismiss the Committee's Claim for a Determination that RCWC's Property (the School Funds) is Property of the Debtor's Bankruptcy Estate (Count 4) ...................................................................................... 24

Document Prepared
on Recycled Paper

redacted

-iii-

V.    CONCLUSION ................................................................................................26

DOCUMENT PREPARED
ON RECYCLED PAPER

redacted

- iv -

# <u>TABLE OF AUTHORITIES</u>

Page(s)

**Cases**

*21st Century Fin. Servs., LLC v. Manchester Fin. Bank,*
255 F. Supp. 3d 1012 (S.D. Cal. 2017) ................................................................ 25

*In re Am. Camshaft Specialties, Inc.,*
410 B.R. 765 (Bankr. E.D. Mich. 2009) ............................................................... 16

*Apple Inc. v. Allan & Assocs. Ltd.,*
445 F. Supp. 3d 42 (N.D. Cal. 2020) ................................................................... 23

*In re Archdiocese of St. Paul & Minneapolis,*
553 B.R. 693 (Bankr. D. Minn. 2016) .................................................................. 24

*In re Aroonsakool,*
2014 WL 1273696 (B.A.P. 9th Cir. Mar. 28, 2014) ............................................. 16

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ............................................................................................ 10

*Assoc. Vendors, Inc. v. Oakland Meat Co.,*
210 Cal. App. 2d 825 (Cal. Ct. App. 1962) ......................................................... 17

*In re Augie/Restivo Baking Co.,*
860 F.2d 515 (2d Cir. 1988) ............................................................... 13, 16, 22

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) ............................................................................................ 10

*In re Bonham,*
229 F.3d 750 (9th Cir. 2000) .......................................................... 12, 13, 16, 21

*Butner v. United States,*
440 U.S. 48 (1979) .............................................................................................. 25

*Calvert v. Huckins,*
875 F. Supp. 674 (E.D. Cal. 1995) ....................................................................... 17

*Conde v. Sensa,*
2016 WL 6082309 (S.D. Cal. Oct. 17, 2016) ....................................................... 20

*Corcoran v. CVS Health Corp.,*
169 F. Supp. 3d 970 (N.D. Cal. 2016) ................................................................. 21

*Coto Settlement v. Eisenberg,*
593 F.3d 1031 (9th Cir. 2010) ............................................................................. 11

*Dalian Sunsmile Outdoor Co., Ltd. v. WTN, Inc.,*
2024 WL 5369731 (C.D. Cal. Sept. 25, 2024) ..................................................... 21

DOCUMENT PREPARED
ON RECYCLED PAPER

*Daniels-Hall v. National Educ. Ass'n,*
    629 F.3d 992 (9th Cir. 2010) ............................................................................ 11

*Doe v. Unocal Corp.,*
    248 F.3d 915 (9th Cir. 2001) ............................................................................ 20

*Fletcher v. Atex, Inc.,*
    68 F.3d 1451 (2d Cir. 1995) ............................................................................ 20

*Gerritsen v. Warner Bros. Entm't,*
    116 F. Supp. 3d 1104 (C.D. Cal. 2015) ...................................................... 18, 20

*In re Gilead Scis. Sec. Litig.,*
    536 F.3d 1049 (9th Cir. 2008) .......................................................................... 10

*Hood v. Handi-Foil Corp.,*
    2024 WL 4008711 (N.D. Cal. Aug. 29, 2024) ................................................. 17

*In re Howland,*
    674 F. App'x 482 (6th Cir. 2017) .......................................................... 12, 14, 15

*Int'l Petro Prods. & Additives Co. v. Black Gold S.A.R.L.,*
    115 F.4th 1202 (9th Cir. 2024) ........................................................................ 25

*Joiner v. Ryder Sys.,*
    966 F. Supp. 1478 (C.D. Ill. 1996) .................................................................. 20

*Kelly v. Elec. Arts, Inc.,*
    2015 WL 1967233 (N.D. Cal. Apr. 30, 2015) ................................................. 11

*Khoja v. Orexigen Therapeutics, Inc.,*
    898 F.3d 988 (9th Cir. 2018) ............................................................................ 11

*Las Palmas Assocs. v. Las Palmas Ctr. Assocs.,*
    235 Cal. App.3d 1220 (Cal. Ct. App. 1991) .................................................... 17

*Manzarek v. St. Paul Fire & Marine Ins. Co.,*
    519 F.3d 1025 (9th Cir. 2008) .................................................................... 10, 24

*Matyas v. Summerkids, Inc.,*
    2022 WL 17887608 (C.D. Cal. May 16, 2022) ............................................... 22

*Mendiondo v. Centinela Hosp. Med. Ctr.,*
    521 F.3d 1097 (9th Cir. 2008) .......................................................................... 10

*MH Pillars Ltd. v. Realini,*
    2017 WL 916414 (N.D. Cal. Mar. 8, 2017) ..................................................... 19

*Morse Operations, Inc. v. Robins LE-COCQ, Inc. (In re Lease-A-Fleet, Inc.),*
    141 B.R. 869 (Bankr. E.D. Pa. 1992) .............................................................. 22

*Mou v. SSC San Jose Operating Co. LP,*
    415 F. Supp. 3d 918 (N.D. Cal. 2019) ............................................................. 24

DOCUMENT PREPARED
ON RECYCLED PAPER

*Neilson v. Union Bank of California,*
    N.A., 290 F. Supp. 2d 1101 (C.D. Cal. 2003) ...................................................... 17

*NetApp, Inc. v. Nimble Storage,*
    2015 WL 400251 (N.D. Cal. Jan. 29, 2015) ........................................................ 21

*Official Comm. of Unsecured Creditors v. Archdiocese of St. Paul & Minneapolis*
    (*In re Archdiocese of St. Paul & Minneapolis*),
    888 F.3d 944 (8th Cir. 2018)............................................................................... 13

*In re Owens Corning,*
    419 F.3d 195 (3d Cir. 2005).......................................................... 12, 13, 14, 16, 21

*R2 Investments, LDC v. World Access, Inc. (In re World Access, Inc.),*
    301 B.R. 217 (Bankr. N.D. Ill. 2003).................................................................. 22

*In re Republic Airways Holding Inc.,*
    565 B.R. 710 (Bankr. S.D.N.Y. 2017) ................................................................ 14

*Reynolds v. Binance Holdings, Ltd.,*
    481 F. Supp. 3d 997 (N.D. Cal. 2020) ................................................................ 23

*Rollins Burdick Hunter of So. Cal. v. Alexander & Alexander Servs.,*
    206 Cal. App. 3d 1 (Cal. Ct. App. 1988) ............................................................ 18

*Roman Catholic Archbishop v. Superior Court,*
    15 Cal. App. 3d 405 (Cal. Ct. App. 1971) .......................................................... 18

*Sandoval v. Ali,*
    34 F. Supp. 3d 1031 (N.D. Cal. 2014) ................................................................ 17

*SEC v. Hickey,*
    322 F.3d 1123 (9th Cir. 2003).......................................................................... 18, 19

*Seiko Epson Corp. v. Print-Rite Holdings, Ltd.,*
    2002 WL 32513403 (D. Or. Apr. 30, 2002) ...................................................... 19

*In re SK Foods, LP,*
    499 B.R. 809 (Bankr. E.D. Cal. 2013) ................................................................ 16

*Smith v. Simmons,*
    638 F. Supp. 2d 1180 (E.D. Cal. 2009) ............................................................... 22

*Sonora Diamond Corp. v. Superior Court,*
    83 Cal. App. 4th 523 (Cal. Ct. App. 2000) ................................... 17, 18, 20, 22, 23

*Sprewell v. Golden State Warriors,*
    266 F.3d 979 (9th Cir. 2001)................................................................................ 10

*Srinvasan v. Kenna,*
    2019 WL 1118123 (N.D. Cal. Mar. 11, 2019) .................................................... 17

*Sun Grp. U.S.A. Harmony City, Inc. v. CRRC Corp. Ltd.,*
    2024 WL 219331 (N.D. Cal. May 14, 2024) .................................................. 18, 20

DOCUMENT PREPARED
ON RECYCLED PAPER

*Swartz v. KPMG LLP*,
    476 F.3d 756 (9th Cir. 2007) (per curiam) ............................................................ 11

*Toho-Towa Co., Ltd. v. Morgan Creek Productions, Inc.*,
    217 Cal. App. 4th 1096 (Cal. Ct. App. 2013) ................................................. 17, 18

*United States v. Ritchie*,
    342 F.3d 903 (9th Cir. 2003) ................................................................................. 11

*In re Verestar, Inc.*,
    343 B.R. 444 (Bankr. S.D.N.Y. 2006) ................................................................. 15

*Wady v. Provident Life and Accident Ins. Co. of America*,
    216 F. Supp. 2d 1060 (C.D. Cal. 2002) ................................................................ 17

*Walsh v. Kindred Healthcare*,
    798 F. Supp. 2d 1073 (N.D. Cal. 2011) .......................................................... 17, 23

*Xyience Bev. Co. LLC v. Statewide Bev. Co. Inc.*,
    2015 WL 13333486 (C.D. Cal. Sept. 24, 2015) ............................................. 19, 21

**Rules and Statutes**

Fed. R. Civ. P. 9(b) ................................................................................................. 17, 18

Fed. R. Civ. P. 12(b)(6) ................................................................................... 10, 11, 26

DOCUMENT PREPARED
ON RECYCLED PAPER

Case: 24-04053    Doc# 35    Filed: 05/23/25    Entered: 05/23/25 17:27:55    Page 8 of 34

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.  PRELIMINARY STATEMENT

The Committee's Amended Complaint fails to remedy the fundamental flaws of its prior pleading and should be dismissed in its entirety. The Committee recycles nearly all the same allegations to support its re-pleaded claims for substantive consolidation against the Non-Debtor Defendants, while the few newly pleaded allegations are either conclusory or directly contradicted by the documents on which the Committee relies.

To state a claim for substantive consolidation, the Committee must plausibly allege either: (i) that creditors actually treated the Debtor and the Non-Debtor Defendants as a single economic unit and did not rely on their separateness in extending credit, or (ii) that the entities' financial affairs are so inextricably entangled that disentanglement would harm creditors. The Committee satisfies neither standard. Instead, on the first prong, it offers only conclusory allegations of "control" and selectively mischaracterizes documents that, when read in full, reflect nothing more than a shared religious mission and cooperative relationship—not the kind of creditor confusion or operational unity required for consolidation. The notion that sophisticated financial institutions that lent the Debtor tens of millions of dollars were misled into treating the Debtor and the Non-Debtor Defendants as one indistinguishable entity is implausible, particularly where those same institutions (i) received separate financial statements, corporate guarantees, and pledges of distinct assets, and (ii) in fact treated the Debtor and Non-Debtor Defendants as separate entities based on the agreements cited in the Amended Complaint.

On the second prong, the Committee does not allege that it would be practically impossible or prohibitively expensive to untangle the entities' affairs. Nor does it show that any such entanglement would threaten the realization of assets for creditors. Instead, the Committee attempts to repackage its flawed entanglement theory under the guise of alter ego liability. But this too fails. The Amended Complaint does not allege the level of domination and control required to disregard corporate separateness, nor does it identify any wrongful conduct or abuse by the Non-Debtor Defendants that would justify such an extreme remedy. Shared officers, administrative services,

Document Prepared on Recycled Paper

and overlapping governance structures are insufficient to establish alter ego liability, particularly in the absence of allegations of fraud or injustice. The bare allegations of "historical commingling"—with no reference to when the purported commingling occurred or the amounts involved—cannot alone change that result.

Finally, the Committee's new claim for a determination that the Debtor is the equitable owner of the School Funds is refuted by the very documents it cites, which confirm RCWC's control over the funds. Even if the claim were viable, it is not a cognizable claim under California law, or it belongs to the estate and therefore the Committee lacks standing to assert it.

For these reasons, and those set forth more fully below, the Amended Complaint should be dismissed.

## II. FACTUAL BACKGROUND[1]

### A. The Roman Catholic Diocese of Oakland.

The Roman Catholic Diocese of Oakland (the "Diocese") is the territorial division of the Roman Catholic Church in Contra Costa and Alameda Counties in California. (Compl. ¶ 18). The Diocese is composed of various administrative units, including the Central Services Administration of the Diocese (the "Chancery"). (Id. ¶ 21). Within the geographic territory of the Diocese, there are ten nonprofit corporate entities, including the Debtor, RCWC, RCC, and Adventus. (App. at p. A-10).[2] The revenues, expenses, assets, and liabilities of the Chancery and parishes are accounted for separately from those of RCWC, RCC, and Adventus. (Off. Memo. at p. 23; App. at pp. A-12–A-13, A-15; see Compl. ¶¶ 35, 41, 45).

The bishop (the "Bishop"), currently the Most Reverend Michael C. Barber, S.J., is the religious leader of the Diocese. (Compl. ¶¶ 47, 52). Within the Diocese, the Bishop sets the policy for the Roman Catholic Church and makes executive and administrative decisions, just like other

---

[1] Unless stated otherwise, the summary below is based on the non-conclusory factual allegations in the Amended Complaint, which the Non-Debtor Defendants have assumed to be true solely for the purpose of the Motion, the documents incorporated by reference in the Amended Complaint, which the Non-Debtor Defendants have attached to the Declaration of Ryan E. Manns filed concurrently herewith, and matters of which this Court may take judicial notice.

[2] A true and correct copy of that certain Offering Memorandum for the Roman Catholic Bishop of Oakland Taxable Bonds, Series 2007 ("Off. Memo.") and Appendix A ("App.") thereto, are annexed to the Manns Decl. as **Exhibit 1** and **Exhibit 2**, respectively.

DOCUMENT PREPARED
ON RECYCLED PAPER

dioceses and the bishops that lead them all over the world. (App. at p. A-2; *see* Compl. ¶ 52). In this role, the Bishop appoints principal staff members of the Diocese and is the incumbent of the Debtor. (App. at p. A-2). He bears responsibility for personnel decisions within the Diocese. (*Id.*). He receives advice primarily from two groups of consultive bodies: the Diocesan Consultors (the "<u>College of Consultors</u>") for religious and social-service activities of the Diocese and a Finance Council for all matters relating to financial operations, policies, and procedures for the Diocese. (App. at pp. A-2, A-7, A-8; *see* Compl. ¶¶ 39-40).

The Bishop has responsibility for the Diocesan budget, but parish and school budgets are not centrally prepared. Rather, the budgets are prepared by the pastor, pastoral counsel, parish finance council and school administration of each parish, subject to Diocesan budgetary guidelines. (App. at pp. A-17–A-18). The Bishop's Finance Council prepares Diocesan budgets, reviews parish and school budgets, and oversees investment policies, among other things for the Diocese. (App. at p. A-7). Capital expenditures exceeding $50,000 for parish and parish school budgets must be reviewed by the College of Consultors and the Debtor's chief financial officer, and then submitted to the Bishop for his approval. (App. at p. A-18; *see* Compl. ¶ 33-34). The Bishop is responsible for the collection of certain revenues earned or donated within the parishes of the Diocese to fund Diocesan activities and obligations. (App. at p. A-2; *see* Compl. ¶ 50).

B.      <u>The Non-Debtor Defendants.</u>

1.      *The Roman Catholic Welfare Corporation of Oakland.*

RCWC is a California nonprofit religious corporation that initiates, administers, and supervises the educational programs of the Roman Catholic Church within the Roman Catholic Diocese of Oakland. (Compl. ¶ 12; App. at p. A-19). It has no members or shareholders. (App. at p. A-5; RCWC's Bylaws § 2.1).[3] It oversees 32 parochial elementary schools and two high schools within the Diocese. (Compl. ¶ 12). RCWC is the legal owner of all school real property within the Diocese. (App. at p. A-10). ███████████████

████████████████████████████

---

[3] A true and correct copy of RCWC's Bylaws are annexed to the Manns Decl. as **Exhibit 3**.

DOCUMENT PREPARED
ON RECYCLED PAPER

RCWC's business and affairs are managed separately from the Diocese by a board of seven directors, comprised of four directors appointed by the Debtor and three independent directors selected by those four appointees. (RCWC's Bylaws § 3.3; *see* Compl. ¶ 32). RCWC's board, not the Debtor, has the power to manage the corporation in a manner it deems best, solely in a manner consistent with the corporation's stated purpose and applicable law. (RCWC's Bylaws § 3.1). Among other powers, RCWC's directors have the authority to delegate management responsibility to officers they appoint, and on behalf of RCWC, to borrow money, incur indebtedness, and transfer funds and property owned by RCWC. (*Id.* §§ 3.1(b), (c), 4.2, 4.3). The directors are not allowed to receive compensation for their service. (*Id.* § 3.7). RCWC's bylaws require the corporation to account on an annual basis for its assets and liabilities, including trust funds. (*Id.* § 6.3).

### 2. The Roman Catholic Cemeteries of the Diocese of Oakland.

RCC is a California nonprofit religious corporation that provides burial and related interment services for members of the Roman Catholic Church within the Diocese. (Compl. ¶ 14; RCC's Bylaws § 2).[4] It has no members or shareholders. (RCC's Bylaws § 3.1; App. at p. A-10). It operates and administers six diocesan cemeteries, five diocesan mortuaries, two mausoleums, and one crematory on land owned by and leased from the Debtor. (Compl. ¶¶ 14, 36–39; App. at p. A-20). Management of RCC's business is run by a board of directors, each selected by the Debtor, and officers to whom management responsibility is delegated by the board. (RCC Bylaws § 4.1(a), (c)). RCC's board, not the Debtor, has the power to manage the corporation's affair as it deems best, in accordance with applicable law, RCC's bylaws, and its articles of incorporation. (*Id.* § 4.1(b)). The directors may not be compensated for their service on the board. (*Id.* § 4.7). ████

████████████████████████████████████████████

███████████████████████

### 3. Adventus.

Adventus is a California nonprofit public benefit corporation formed to perform various functions for the Diocese, including those related to the ownership of real estate. (Adventus'

---

[4] A true and correct copy of RCC's Bylaws are annexed to the Manns Decl. as **Exhibit 4**.

Document Prepared
on Recycled Paper

Bylaws § 2;[5] *see* Compl. ¶ 21). Adventus has no members or shareholders. (Adventus' Bylaws § 3.1; App. at p. A-10). It holds title to certain single-family residences in Byron and Hayward and undeveloped land in Livermore. (Compl. ¶ 16). Adventus' business is managed by a board of directors, each selected by the Debtor, and officers the directors may delegate with management responsibility. (*Id.* ¶ 44; Adventus' Bylaws § 4.1(a), (c)). Adventus' board, not the Debtor, has the specific power to manage the corporation's affairs as it deems best, in accordance with applicable law, the corporation's bylaws, and its articles of incorporation. (Adventus Bylaws' § 4.1(b)). The directors are not allowed to receive compensation for their services as directors. (*Id.* § 4.7).

██████████████████████████████████████████████████████████████████

█████████████████

    C.      The Relationship Between the Debtor and the Non-Debtor Defendants.

          1.      *Directors and Officers of the Debtor and Non-Debtor Defendants.*

Over the last 60 years, several individuals served as officers or directors for the Debtor and one or more of the Non-Debtor Defendants. (Compl. ¶ 25). Below is a chart (based on the foregoing allegations in the Amended Complaint) depicting the few times those individuals held contemporaneous positions with the Debtor and a Non-Debtor Defendant:

|  | Paul Bongiovanni | Michael Canizzaro | John S. Cummins | Floyd Begin |
|---|---|---|---|---|
| Debtor | 2017 (CFO) | 2007 (Attorney-in-Fact) | 1977-2003 (Bishop), 1999-2002 (President, CEO, CFO, Secretary, and agent) | 1962-1977 (Bishop) |
| RCC | 2019 (CFO), 2023-2024 (CFO, Secretary) | 2007 (Treasurer) | N/A | N/A |
| RCWC | 2020-2022 (Secretary, Agent) | 2007 (Secretary, Assistant Treasurer) | 1962 (Director), 1979 (President) | 1962 (Director), 1967 (President, CEO) |

---

[5] A true and correct copy of Adventus' Bylaws are annexed to the Manns Decl. as **Exhibit 5**.

DOCUMENT PREPARED ON RECYCLED PAPER

| Adventus | 2019-2021 (President, CEO, CFO,[6] Agent[7]) | 2007 (VP) | N/A | N/A |
|---|---|---|---|---|

    2.    *The 2007 Bond Issuance.*

█████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████

████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████

---

DOCUMENT PREPARED
ON RECYCLED PAPER

[6] Mr. Bongiovanni served as Adventus' CFO in 2019. (Compl. ¶ 25(i)).

[7] Mr. Bongiovanni served as agent for service of process for Adventus in 2019 and 2021. (*Id.*).

[8] Throughout the Amended Complaint, the UCC refers to and quotes from the Bond Offering Memorandum and its accompanying Appendix A (*See* Compl. ¶¶ 58–65, 120, 123, 131, 133, 141, 143).

- 6 -



Document Prepared
on Recycled Paper

### 3.    The 2017 PNC Bank Debt.

In 2017, the Debtor, as borrower, borrowed $70 million for the purpose of funding the redemption of the outstanding Bonds (the "PNC Bank Debt") pursuant to that certain Credit and Security Agreement with PNC Bank (f/k/a Compass Bank), as lender, dated as of February 1, 2017 (the "Credit Agreement"). (Compl. ¶ 110). The Non-Debtor Defendants served as guarantors under the Credit Agreement. (*Id.* ¶ 111).

In the event a payment would not be made on time, the Debtor agreed to take certain steps to raise additional income to avoid or cure a default. Specifically, the Debtor, "through the Bishop of Oakland," agreed that with "public juridic persons subject to his governance," would dispose of those persons' assets, increase the customary rate of cathedraticum, impose exaction, increase fees, and institute a diocesan-wide extraordinary appeal. (Credit Agreement, ¶ 6.15).[10]

As conditions precedent to the effectiveness of the Credit Agreement, each Non-Debtor Defendant was required to supply to PNC Bank its organizational documents, resolutions authorizing its entry into the agreement, certificates of good standing, and certificates of property and liability insurance naming the Lender as an additional insured. (*Id.* ¶ 4.01((a)(iii), (iv), (c)). Each Non-Debtor Defendant represented to PNC Bank that it has all "requisite power and authority under applicable Law" to "own its assets" including any and all related "Facilities" i.e. "land, leasehold interests and buildings and all fixtures and equipment (as defined in the UCC)." (*Id.* ¶ 5.01). And it did not require approval from any other person under any applicable law, including Canon law, to perform under the Credit Agreement. (*Id.* ¶ 5.04). Moreover, each Non-Debtor Defendant agreed to supply separate and combined financial statements to PNC Bank. (*Id.* ¶ 6.01).

### 4.    The Oakland Parochial Fund Transfer.

In April and May of 2023, the Debtor transferred approximately $106 million to the Oakland Parochial Fund ("OPF"), consisting ████████████████████

████████████████████████████████████████████

---

[10] A true and correct copy of that certain Credit and Security Agreement, dated as of February 1, 2017, by and between PNC Bank (f/k/a Compass Bank), as lender, and the Roman Catholic Bishop of Oakland, as borrower, and RCWC, RCC, and Adventus, as guarantors, is annexed to the Manns Decl. as **Exhibit 6**.

DOCUMENT PREPARED ON RECYCLED PAPER

1    ███████████████████████████████████ (the "<u>OPF Transfer</u>"). (Compl. ¶¶ 85-86). According

2    to the Amended Complaint, the OPF Transfer was accomplished through a series of agreements

3    between the Debtor and OPF, ██████████████████████████████████

4    ████████████████████████████████████████████████

5    ████████████████████

6        ████████████████████████████████

7    ████████████████████████████████████████████████

8    ████████████████████████████████████████████████

9    ████████████████████████████████████████████████

10    ████████████████████████████████████████████████

11    ████████████████████████████████████████████████

12    ███████████ ███████████████████████████████████

13    ████████████████████████████████████████████████

14    ████████████████████████████████████████████████

15    ████████████████

16          *5.    Other Alleged Connections Between the Debtor and the Non-Debtor*

17          *Defendants.*

18        The Debtor and each Non-Debtor Defendant has the same business and mailing address.

19    (Compl. ¶¶ 11, 13, 15, 17). The administrative functions of the Diocese "are centered" in the

20    Chancery, which provides various administrative services and financial services to the entities

21    within Diocese. (*Id*. ¶¶ 27–30). The Debtor's website contains a directory for entities and services

22    associated with the Diocese, including links with information about the Non-Debtor Defendants.

23    (*Id*. ¶ 26). Specifically, the website provides information concerning (i) Diocesan funeral and

24

---

25    [11] A true and correct copy of that certain Investment Account Agreement, dated April 1, 2023, by and between RCWC and OPF ("<u>IAA Agreement</u>") is annexed to the Manns Decl. as **Exhibit 6.** ████████

26    ████████████████████████████████████████████████

27    ████████████████████████████████████████████████

28    ████████████████████████████████████████████████

DOCUMENT PREPARED ON RECYCLED PAPER

1    cemetery services that links to RCC's website and (ii) Diocesan schools. (*Id*. ¶¶ 26, 31).

2           Prior to the OPF Transfer, the Debtor held and managed deposits and investments on behalf

3    of itself, Diocesan churches, and RCWC in bank and investment accounts titled in the Debtor's

4    name through a Deposit and Loan Fund program ("DLF") and an Investment/Endowment Pool.

5    (Compl. ¶¶ 70, 72, 74). According to the Committee, the Non-Debtor Defendants were obligated

6    to deposit their excess funds in the DLF for the benefit of DLF participants and, upon information

7    and belief, those funds were historically commingled with funds belonging to others. (*Id*. ¶¶ 71,

8    77).

9                           **III.    LEGAL STANDARD**

10          Rule 12(b)(6) authorizes the Court to dismiss a complaint for failure to state a claim upon

11   which relief can be granted. Fed. R. Civ. P. 12(b)(6).  Dismissal under Rule 12(b)(6) is appropriate

12   if "the complaint lacks a cognizable legal theory" or "sufficient facts to support a cognizable legal

13   theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).

14          To survive a Rule 12(b)(6) motion, a complaint must plead sufficient factual allegations

15   sufficient to state a claim for relief that is plausible on its face. *See Ashcroft v. Iqbal*, 556 U.S. 662,

16   678 (2009) (citations omitted); *accord Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A

17   claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw

18   the reasonable inference that the defendant is liable for the misconduct alleged. *Id*. The court's task

19   on a motion to dismiss is "context-specific" and requires it "to draw on its judicial experience and

20   common sense." *Iqbal*, 556 U.S. at 679.

21          To make this context-specific evaluation, courts must generally accept factual allegations

22   in the complaint as true and construe the pleadings in the light most favorable to the plaintiff.

23   *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  But courts need

24   not accept as true "a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678.  Nor

25   must courts "accept as true allegations that are merely conclusory, unwarranted deductions of fact,

26   or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008)

27   (quoting *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001)). Allegations

28   contradicted by documents incorporated by reference are likewise not entitled to a presumption of

DOCUMENT PREPARED
ON RECYCLED PAPER

truth. *See Daniels-Hall v. National Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010) (dismissing ERISA claim based in part on documents incorporated by reference that contradicted allegations in the complaint); *Kelly v. Elec. Arts, Inc.*, 2015 WL 1967233, at *8 (N.D. Cal. Apr. 30, 2015) ("the inference that defendants used the term [de-risk] to promise the elimination of technological risks is contradicted by the documents which plaintiffs incorporate into their complaint by reference and is therefore entitled to no presumption of truth.").

When deciding a Rule 12(b)(6) motion, courts consider the factual allegations contained within the four corners of the complaint, exhibits attached to the complaint, and matters subject to judicial notice. *Swartz v. KPMG LLP,* 476 F.3d 756, 763 (9th Cir. 2007) (per curiam). However, documents a plaintiff refers to extensively or that form the basis for the plaintiff's claim may be incorporated by reference into the complaint and therefore considered part of the pleading. *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). This "prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken – or doom – their claims." *Khoja v. Orexigen Therapeutics, Inc.,* 898 F.3d 988, 1002 (9th Cir. 2018). Ninth Circuit courts may additionally consider a document to be incorporated "in situations where the complaint necessarily relies upon a document or the contents of the document are alleged in a complaint, the document's authenticity is not in question and there are no disputed issues as to the document's relevance." *Coto Settlement v. Eisenberg*, 593 F.3d 1031, (9th Cir. 2010).

## IV.    **ARGUMENT**

The Court should dismiss all four counts in the Amended Complaint. Count One (Substantive Consolidation of the Debtor and RCWC), Count Two (Substantive Consolidation of the Debtor and RCC) and Count Three (Substantive Consolidation of the Debtor and Adventus) each fail because the allegations in the Amended Complaint fail to plead sufficient facts to support substantive consolidation under the creditor reliance or entanglement tests established by the Ninth Circuit. Count Four (Declaratory Relief that the Debtor is the equitable owner of the School Funds) is not legally viable because it is contradicted by the documents on which the Committee relies. Alternatively, Count Four fails because the Committee does not state a cognizable claim for relief,

Document Prepared
on Recycled Paper

and to the extent the Committee does state a claim, Count Four is an impermissible attempt to assert estate claims for which the Committee lacks standing to pursue.

A.  The Court Should Dismiss the Claims for Substantive Consolidation Because the Committee Has Not Plausibly Alleged the Three Ninth Circuit Requirements for Substantive Consolidation (Counts 1, 2, and 3).

Substantive consolidation is not a right or claim found in the text of the Bankruptcy Code. Rather, it is a judicially created equitable remedy derived from a bankruptcy court's "general equity powers" found "in §105(a) of the Bankruptcy Code." *In re Bonham*, 229 F.3d 750, 764 (9th Cir. 2000). When applied, the doctrine allows the bankruptcy court to disregard the corporate form of separate legal entities, treat them as if they were merged into a single surviving entity, and pool their combined assets and liabilities together into a combined fund so that the claims of creditors against the separate entities are transformed into claims against the consolidated survivor. *See id.*

Courts have characterized substantive consolidation as both "extreme" (it may seriously affect the rights of creditors and non-debtor third parties) and "imprecise" (the Bankruptcy Code and substantive state law afford more precise remedies, for example, in the form of fraudulent transfer law). *See In re Owens Corning*, 419 F.3d 195, 211 (3d Cir. 2005). Therefore, substantive consolidation should be used sparingly, particularly when directed against entities not already in bankruptcy, and even then, only as a "last resort after considering and rejecting other remedies." *Id.*; *see also In re Howland*, 674 F. App'x 482, 488 (6th Cir. 2017) ("Substantive consolidation is an 'extreme' measure, only to be used 'sparingly,' especially when consolidating a non-debtor entity."); *Bonham*, 229 F.3d at 767 ("'resort to consolidation . . . should not be Pavlovian,' but as almost every other court has noted, should be used 'sparingly,' and in keeping with the equitable nature of substantive consolidation.") (internal citations omitted).

In *Bonham*, the Ninth Circuit established a two-part disjunctive test for courts to consider when deciding a request for substantive consolidation: "(1) whether creditors dealt with the entities as a single economic unit and did not rely on their separate identity in extending credit; or (2) whether the affairs of the debtor are so entangled that consolidation will benefit all creditors." 229 F.3d at 766 (adopting Second Circuit's test in *In re Augie/Restivo Baking Co.*, 860 F.2d 515, 518

(2d Cir. 1988)). Regardless of which test is considered, broadly speaking, courts should evaluate whether there has been a "disregard for corporate formalities or commingling of assets" by the targeted entities and "the benefits that substantive consolidation would bring against the harms that it would cause." *Id.* at 765.

Here, the Committee fails to allege sufficient facts to satisfy either prong of the *Bonham* test, or how the benefits of substantive consolidation outweigh the detriments to the Non-Debtor Defendants and their creditors. Therefore, the Committee's claims for substantive consolidation against the Non-Debtor Defendants (Counts 1, 2, and 3) must be dismissed.[12]

>    1.    *The Committee Has Failed to Adequately Allege Creditor Treatment of the*
>    *Non-Debtor Defendants and Debtor as a Single Economic Unit and Reliance*
>    *on their Supposed Unity in Extending Credit.*

The creditor reliance test for substantive consolidation is based on the notion that lenders "structure their loans according to their expectations regarding the borrower and do not anticipate either having the assets of a more sound company available in the case of insolvency or having the creditors of a less sound debtor compete for the borrower's assets." *Bonham*, 229 F.3d at 766. (quoting *Augie/Restivo Baking Co.*, 860 F.2d at 518-19); *see Owens Corning*, 419 F.3d at 211, n.19 (explaining this factor is "meant to protect the prepetition expectations of those creditors" who in the typical scenario "have been misled by debtors' actions…and thus perceived incorrectly (and relied on this perception) that multiple entities were one.").

In this second round of pleading, the Committee relies on the same cherry-picked and out-of-context quotes related to agreements with two sets of creditors: (i) the Debtor's pre-petition credit agreement with PNC and (ii) the offering memorandum provided to investors in connection

---

[12] The Non-Debtor Defendants incorporate by reference the arguments set forth in the *Motion of the Roman Catholic Welfare Corporation of Oakland, the Roman Catholic Cemeteries of the Diocese of Oakland and Adventus to Dismiss Complaint* [Dkt No. 9] and *Reply Memorandum in Support of the Motion of the Roman Catholic Welfare Corporation of Oakland, the Roman Catholic Cemeteries of the Diocese of Oakland and Adventus to Dismiss Complaint* [Dkt. No. 25], that as non-debtor non-profit entities, they may not be forced into the equivalent of an involuntary bankruptcy through substantive consolidation. *See Official Comm. of Unsecured Creditors v. Archdiocese of St. Paul & Minneapolis* (*In re Archdiocese of St. Paul & Minneapolis*), 888 F.3d 944 (8th Cir. 2018). For the reasons stated, the Non-Debtor Defendants respectfully disagree that that the Committee may utilize the equitable doctrine of substantive consolidation (whether by alter ego or otherwise) to circumvent the Bankruptcy Code's express prohibition on involuntary bankruptcies against non-profit entities.

DOCUMENT PREPARED
ON RECYCLED PAPER

with the Debtor's 2007 Bond issuance. (Compl. ¶¶ 55–66, 110–112). As explained below, none of these allegations reflect a creditor's views that the Debtor and Non-Debtor Defendants were one and the same. *See In re Republic Airways Holding Inc.*, 565 B.R. 710, 717 (Bankr. S.D.N.Y. 2017) ("The inquiry is whether creditors treated the debtors as a single entity, not whether the managers of the debtors themselves, or consumers viewed the [debtors] as one enterprise.").

With respect to the PNC Bank Loan, the Committee's contention that that creditors dealt with the Debtor and Non-Debtor Defendants as a single economic unit is supported by a single factual allegation: the Non-Debtors Defendants served as guarantors of the Debtor's obligations. (Compl. ¶¶ 110–112). The existence of a guarantor relationship, however, necessarily recognizes the existence of separate legal entities and is the antithesis of treating two entities as the same economic unit. *See Owens Corning*, 419 F.3d at 212-13 (declining to order substantive consolidation based on guarantees from affiliated entities that did not reflect a disregard for the debtor's separateness from the non-debtor guarantors); *see also Howland*, 674 F. App'x at 489 ("In fact, allegations that the debtors personally guaranteed [the non-debtor's] loan and executed an assignment with [the non-debtor] indicate that they held themselves out to the world as separate entities.").

In serving as guarantors on the PNC Bank Debt, the Non-Debtor Defendants made various representations about their separate assets and independent authority to approve entry into those arrangements, and they provided PNC Bank with their individual financial statements, organizational documents, and various corporate certificates. (Credit Agreement, ¶¶ 4.01((a)(iii), (iv), (c), 5.01, 5.04, 6.01, Art. XI). That PNC required a guaranty from the Non-Debtor Defendants reflects PNC's understanding, as an institutional lender and sophisticated third party that had lent the Debtor $70 million, that it was dealing with independent corporate entities—and there are no factual allegations otherwise (e.g., what PNC believed about the parties relationship apart from what is apparent from the face of the Credit Agreement). In light of the terms of the Credit Agreement and lack of other factual allegations, it simply is not plausible that PNC treated the Debtor and Non-Debtors as a single economic unit and did not rely on their separate identities in extending credit. Indeed, the existence of the guaranty is conclusive evidence that PNC *did* rely on

DOCUMENT PREPARED
ON RECYCLED PAPER

1  the separate identities in extending credit.

2       Moreover, the Committee cannot tie the Non-Debtor Defendants to the Debtor's covenant

3  to try to stave off a default by having the Bishop raise additional funds from juridic persons.

4  (Compl. ¶ 112). The plain language of the Credit Agreement does not reflect the Debtor's ability

5  to sell or otherwise use the *Non-Debtor Defendants'* assets to satisfy the Debtor's loan obligation.

6  (Credit Agreement ¶ 6.15, *Compare* "those public juridic persons subject to his governance" *with*

7  the separately defined term, the "Obligated Group"). It stands to reason that if PNC Bank believed

8  the Debtor had the authority to exact additional funds from the Non-Debtor Defendants to prevent

9  a default, there would be no need for PNC Bank to obtain a guaranty from each of them. *See, e.g.*,

10  *In re Verestar, Inc.*, 343 B.R. 444, 463 (Bankr. S.D.N.Y. 2006) (holding the complaint failed to

11  sufficiently allege that creditors saw the debtor and other entity as one due to missing allegations

12  of creditor confusion or the extension of credit based on the target entity's financials).

13       With respect to the Bonds, the Committee attempts to draw a similarly false connection

14  between the Debtor and Non-Debtor Defendants. ██████████████████████████████████

15  ████████████████████████████████████████████████████████████████████████████████████

16  ████████████████████████████████████████████████████████████████████████████████████

17  ████████████████████████████████████████████████████████████████████████████████████

18  ████████████████████████████████████████████████████████████████████████████████████

19  ████████████████████████████████████████████████  Contrary to the Committee's

20  allegations, the Offering Memorandum reflects the independence of the Non-Debtor Defendants

21  from the Debtor. ██████████████████████████████████████████████████████████████████

22  ████████████████████████████████████████████████████████████████████████████████████

23  ████████████████████████████████████████████████

24       At bottom, none of the allegations support the inference that creditors were misled into

25  believing they were dealing with the Debtor and the Non-Debtor Defendants as one

26  indistinguishable entity, or actually treated them that way. *See Howland*, 674 F. App'x at 489

27  (affirming dismissal of claim for substantive consolidation due to the lack of allegations about

28  distributing misleading information to creditors, inaccurately recording transactions with creditors,

DOCUMENT PREPARED
ON RECYCLED PAPER

or otherwise misleading creditors into thinking the entities were the same enterprise). Missing from the Amended Complaint are allegations about what PNC or Deutsche Bank or prospective purchasers of the Bonds understood about the Non-Debtor Defendants or how they relied on that information in extending credit. For example, the Committee does not allege PNC misunderstood which of the Debtor or Non-Debtor Defendants would be legally responsible for the PNC Bank Debt, or in the case of Deutsche Bank, who was responsible for paying debt service on the Bonds. *See In re Am. Camshaft Specialties, Inc.*, 410 B.R. 765, 789 (Bankr. E.D. Mich. 2009) (dismissing substantive consolidation claim for lack of allegations "that any creditors of any of these Debtors or non-debtors somehow believed they were not separate entities or relied on them as one single entity"). Nor does the Committee allege, for example, that PNC made its credit decision thinking that the Debtor and Non-Debtor Defendants were the same entity. The Non-Debtor Defendants' guaranty of the PNC Bank Debt demonstrates the opposite. *See Owens Corning*, 419 F.3d at 195 (holding creditor reliance test not met where bank made credit decision based on the procurement of corporate guarantees of the entities targeted for substantive consolidation).

> ### 2. The Committee Has Not Sufficiently Alleged the Hopeless Entanglement of the Debtor's and Non-Debtor Defendants' Affairs.

A claim for substantive consolidation may be justified under an entanglement theory only where "the time and expense necessary even to attempt to unscramble [the debtors' affairs] is so substantial as to threaten the realization of any net assets for all the creditors or where no accurate identification and allocation of assets is possible." *Bonham*, 229 F.3d at 765 (quoting *Augie/Restivo Baking Co.*, 860 F.2d at 519); *see Owens Corning*, 419 F.3d at 211, n.20 (where the entities assets have been "hopelessly commingled" substantive consolidation may be appropriate where without it "all creditors will be worse off (as Humpty Dumpty cannot be reassembled….")).

Ninth Circuit courts may apply alter ego factors to determine whether debtors and non-debtors may be substantively consolidated under the entanglement test. *See, e.g., In re Aroonsakool*, 2014 WL 1273696, at *7 (B.A.P. 9th Cir. Mar. 28, 2014) ("Alter ego doctrine and substantive consolidation overlap when the second factor under *Bonham* is at issue"); *In re SK Foods, LP*, 499 B.R. 809, 833 (Bankr. E.D. Cal. 2013) ("*Bonham* concluded that the presence of traditional 'alter

DOCUMENT PREPARED
ON RECYCLED PAPER

ego' factors formed a basis to find that the affairs of the debtor are so entangled such that consolidation will benefit all creditors"). Here, the Committee alleges the existence of an alter ego relationship under California law as the basis for its theory that the Debtor and Non-Debtor Defendants are hopelessly entangled. (Compl. ¶¶ 116–121, 130–132, 140–142).

To invoke the alter ego doctrine under California law, a plaintiff must plausibly allege two elements: (i) there is such a unity of interest and ownership between two entities that their separate identities do not in reality exist, and (ii) failure to disregard their separate identities would result in fraud or injustice. *Walsh*, 798 F. Supp. 2d at 1082 (citing *Wady v. Provident Life and Accident Ins. Co. of America*, 216 F. Supp. 2d 1060, 1066 (C.D. Cal. 2002); *Sonora Diamond Corp. v. Superior Court*, 83 Cal. App. 4th 523, 538 (Cal. Ct. App. 2000)).[13] Nevertheless, there is a "strong presumption" against disregarding corporate separateness based on the alter ego doctrine. *Srinvasan v. Kenna*, 2019 WL 1118123, at *2 (N.D. Cal. Mar. 11, 2019). Indeed, alter ego is an "extreme remedy" that should only be applied in "exceptional circumstances." *Calvert v. Huckins*, 875 F. Supp. 674, 678 (E.D. Cal. 1995).

Although the alter ego doctrine "does not depend on the presence of actual fraud, it is designed to prevent what would be fraud or injustice, if accomplished." *Assoc. Vendors, Inc. v. Oakland Meat Co.*, 210 Cal. App. 2d 825, 838 (Cal. Ct. App. 1962). Thus, many courts in the Ninth Circuit apply Rule 9(b)'s heighted pleading requirements to alter ego allegations. *See, e.g.*, *Hood v. Handi-Foil Corp.*, 2024 WL 4008711, at *3–4 (N.D. Cal. Aug. 29, 2024) (dismissing claims for failing to satisfy Rule 9(b) due to lack of specific factual averments in support of the alter ego theory); *Sandoval v. Ali,* 34 F. Supp. 3d 1031, 1040 (N.D. Cal. 2014) (imposing a heightened pleading standard, stating that "a plaintiff must allege specifically both of the elements of alter ego liability, as well as facts supporting each" (quoting *Neilson v. Union Bank of California*, N.A., 290 F. Supp. 2d 1101, 1116 (C.D. Cal. 2003)); *Walsh v. Kindred Healthcare*, 798 F. Supp. 2d 1073, 1082 (N.D. Cal. 2011) (setting out the Rule 9(b) standard and concluding that plaintiffs failed to

---

[13] In California, courts apply common principles to determine alter ego liability regardless of whether the plaintiff seeks to impose liability on a shareholder, a parent company, or companies forming a single enterprise. *See Toho-Towa Co., Ltd. v. Morgan Creek Productions, Inc.*, 217 Cal. App. 4th 1096, 1107-1108 (Cal. Ct. App. 2013); *Las Palmas Assocs. v. Las Palmas Ctr. Assocs.*, 235 Cal. App.3d 1220, 1249-50 (Cal. Ct. App. 1991).

DOCUMENT PREPARED
ON RECYCLED PAPER

allege specific facts sufficient to invoke the alter ego doctrine). For the reasons below, the Committee's allegations fail to provide adequate support for both elements of an alter ego theory.

### a. No Unity of Interest and Ownership Between the Debtor and Non Debtor Defendants.

To satisfy the first element, courts typically require the plaintiff to show "such domination of finances, policies and practices that the controlled corporation has, so to speak, no separate mind, will or existence of its own and is but a business conduit for its principal." *Toho-Towa Co., Ltd. v. Morgan Creek Productions, Inc.*, 217 Cal. App. 4th 1096, 1107–1108 (Cal. Ct. App. 2013). When a corporation "dictates every facet" of another corporation's business "from broad policy decisions to routine matters of day-to-day operations" the unity of interest prong is satisfied. *See Gerritsen v. Warner Bros. Entm't*, 116 F. Supp. 3d 1104, 1138, 1142 (C.D. Cal. 2015). However, "merely directing macro decisions is insufficient." *Sun Grp. U.S.A. Harmony City, Inc. v. CRRC Corp. Ltd.*, 2024 WL 219331, at *12 (N.D. Cal. May 14, 2024). There must be much "more than that amount of control of one corporation over another which mere common ownership and directorship would indicate." *Rollins Burdick Hunter of So. Cal. v. Alexander & Alexander Servs.*, 206 Cal. App. 3d 1, 9 (Cal. Ct. App. 1988).

Factors suggesting a unity of interest include "the commingling of funds and other assets of the two entities, the holding out by one entity that it is liable for the debts of the other, identical equitable ownership in the two entities, use of the same offices and employees, and use of one as a mere shell or conduit for the affairs of the other." *Roman Catholic Archbishop v. Superior Court*, 15 Cal. App. 3d 405, 411 (Cal. Ct. App. 1971). Other factors include "inadequate capitalization, disregard of corporate formalities, lack of segregation of corporate records, and identical directors and officers." *Sonora Diamond Corp.*, 83 Cal. App. 4th at 539.

Though no one factor governs, the Ninth Circuit has held that "ownership" of "at least a portion of a corporation" is "a pre-requisite to alter ego liability, and not a mere factor or guideline." *SEC v. Hickey*, 322 F.3d 1123, 1128–29 (9th Cir. 2003) (internal quotations omitted) (citing California law, the Ninth Circuit rejected the plaintiff's argument that an alter ego relationship between the defendant and corporation could be shown even though the defendant did not own any

DOCUMENT PREPARED ON RECYCLED PAPER

portion of it); *MH Pillars Ltd. v. Realini,* 2017 WL 916414, at *12-13 (N.D. Cal. Mar. 8, 2017) (rejecting enterprise theory of alter ego liability on a motion to dismiss based on, among other things, the plaintiff's failure to plead ownership among the alleged corporate alter egos); *Xyience Bev. Co. LLC v. Statewide Bev. Co. Inc.*, 2015 WL 13333486, at *7 (C.D. Cal. Sept. 24, 2015) (holding that failure to plead an ownership interest between the alleged corporate alter egos meant that the plaintiff's theory of alter ego liability "fails at the first step").

The alleged affiliations between the Debtor and the Non-Debtor Defendants fall woefully short of the specific conduct necessary to satisfy the unity of interest element of alter ego.

First, the Committee does not allege an ownership interest by the Debtor in any of the Non-Debtor Defendants, or vice versa. In fact, the Non-Debtor Defendants' corporate governance documents show the Debtors do not hold such interests.[14] This alone is fatal to the Committee's alter ego theory. *See, e.g., Hickey,* 322 F.3d at 1128–29.  And relatedly, there are no allegations that the various Non-Debtors did not follow corporate formalities, such as failing to hold separate board meetings. *See e.g., Seiko Epson Corp. v. Print-Rite Holdings, Ltd.,* 2002 WL 32513403, at *18 (D. Or. Apr. 30, 2002) (adherence to corporate formalities, including holding separate board meetings, indicative of separateness, not an alter ego relationship).

Second, the Committee does not allege that the Debtor was involved in the Non-Debtor Defendants' day-to-day decision-making or internal affairs, let alone that the Debtor directed every facet of their respective businesses. Rather, according to the Complaint, at times, the Bishop allegedly made policy and macro-level decisions for the Diocese, some of which are unrelated or only tangentially related to the Non-Debtor Defendants. *See, e.g.,* (¶ 50) (Bishop charged with collection of revenues for the parishes to fund Diocesan initiatives); (¶ 52) (Bishop charged with setting religious policies for the mission of the Roman Catholic Church within the Diocese); (¶¶ 67–69) (Bishop spearheaded fundraising to benefit Diocesan initiatives and to pay debt service on the Bonds). This type of activity is insufficient to show an alter ego relationship between the Debtor and Non-Debtor Defendants. *See, e.g.,  Doe v. Unocal Corp.*, 248 F.3d 915, 927 (9th Cir. 2001)

---

[14] *See supra*, at pp. 3-5 (describing the Non-Debtor Defendants' lack of members or shareholders as set forth in each entity's Bylaws).

DOCUMENT PREPARED
ON RECYCLED PAPER

("[a] parent corporation may be directly involved in financing and macro-management of its subsidiaries . . . without exposing itself to a charge that each subsidiary is merely its alter ego"); *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1459-60 (2d Cir. 1995) (finding no alter ego liability where parent company's approval required for leases, major capital expenditures, and the sale of subsidiary assets); *Sun Grp. U.S.A. Harmony City, Inc.*, 2024 WL 2193311, at *13 (holding guaranty by the parent company of its subsidiary's loans, providing funding for the subsidiary, filing consolidated annual reports referring to the subsidiary's assets as its own, and directing macro decisions for the subsidiary did not show alter ego); *Joiner v. Ryder Sys.*, 966 F. Supp. 1478, 1485 (C.D. Ill. 1996) (finding no alter ego liability where parent approved subsidiaries' acquisitions and capital budget); *Sonora Diamond Corp.*, 83 Cal. App. 4th at 546-47 (holding parent company's involvement in financing of its subsidiaries' operation, guaranty of key financial obligations, and ongoing financial support insufficient to show alter ego). Indeed, the allegations say nothing about the day-to-day management of any of the Non-Debtor Defendants.

Third, the Debtor's appointment of directors to serve on the boards of directors for the Non-Debtor Defendants (Compl. ¶¶ 24, 32, 40, 43) and the sporadic presence of some shared directors and officers over a 60-year period (*Id.* ¶ 25) do not support alter ego liability. Courts have routinely found these types of allegations insufficient to establish an alter ego relationship. *See, e.g., Unocal Corp.*, 248 F.3d at 927-28 (no alter ego relationship where parent company guaranteed loans for its subsidiary, reviewed and approved major decisions, placed several directors on the subsidiary's board, and was closely involved in its pricing decisions); *Conde v. Sensa*, 2016 WL 6082309, at *3 (S.D. Cal. Oct. 17, 2016) (allegations of control based on shared directors "falls well short of establishing the required extraordinary unity of interest and ownership" between the defendants and the corporation); *Gerritsen*, 116 F. Supp. 3d at 1138-1139 (overlap between directors or executive leadership was not "suggestive of a unity of interest and ownership" but rather "a normal attribute of ownership that officers and directors of the parent serve as officers and directors of the subsidiary.").

Fourth, a common website (Compl. ¶ 26) and shared administrative functions (¶¶ 27–28) are not indicative of an alter ego relationship. *See, e.g., NetApp, Inc. v. Nimble Storage*, 2015 WL

DOCUMENT PREPARED
ON RECYCLED PAPER

400251, at *6 (N.D. Cal. Jan. 29, 2015) (shared administrative functions not indicative of an alter ego relationship); *Corcoran v. CVS Health Corp.*, 169 F. Supp. 3d 970, 984 (N.D. Cal. 2016) ("[C]ourts recognize that separate corporate entities presenting themselves as one online does not rise to the level of unity of interest required to show companies are alter egos.").

<u>Fifth</u>, the Committee's speculative allegation – made on unsubstantiated information and belief – that commingling of funds in the DLF might have historically occurred is inadequate to show an alter ego relationship. (Compl. ¶ 77). To start, the Committee only specifically alleges historic commingling of RCWC and RCC funds (Compl. ¶¶ 120(v), 131(v)). There is no parallel allegation for Adventus. (*See id.* ¶ 141). Further, beyond the bare references to "historically commingled" funds, there are no factual allegations even attempting to explain the nature of the purported commingling—for example when in the "history" of the parties' existences the commingling occurred or how much funds were commingled—let alone allegations that assets are *currently* so "hopelessly commingled" that the "the time and expense necessary even to attempt to unscramble" is substantial. *Owens Corning*, 419 F.3d at 211, n.20; *Bonham*, 229 F.3d at 765.

In fact, the Committee does not allege that any of the Non-Debtor Defendants actually deposited funds in the DLF, only that the "DLF was an internal savings and loan program owned and operated by the Debtor. . . [that] requires the Non-Debtor [Defendants] (among others) to deposit their excess funds with DLF for the benefit of the churches, schools, and cemeteries within the Diocese," (Compl. ¶ 71) and that RCWC and other unspecified entities "separately invested funds with long-term investment goals in marketable securities through the Diocesan Investment Management Services." (*Id.* ¶ 74). Without specific factual allegations of commingling or diversion of assets by the Debtor, the Committee's allegations do not support alter ego liability sufficient to withstand dismissal. *See, e.g., Dalian Sunsmile Outdoor Co., Ltd. v. WTN, Inc.*, 2024 WL 5369731, at *4 (C.D. Cal. Sept. 25, 2024) (allegations of payments directed by the defendants to themselves and others were insufficiently detailed to show how the defendants commingled or diverted corporate funds for the purpose of imposing alter ego liability); *Xyience Bev. Co. LLC*, 2015 WL 13333486, at *7 (conclusory allegations that the alleged alter egos "commingled and intermingled" certain funds were insufficiently detailed to support the unity of interest element of alter ego).

DOCUMENT PREPARED
ON RECYCLED PAPER

At bottom, the Committee's minimal allegations of interrelatedness between the Debtor and Non-Debtor Defendants do not begin to approach the "level of hopeless obscurity of interrelationships of the group" that warrant consolidation on an entanglement theory. *See Augie/Restivo*, 860 F. 2d at 515 (lack of entanglement between the debtor and non-debtor entities where the available records permitted the identification of separately owned real property, and the calculation of separate account balances for inventories, liabilities, and receivables); *R2 Investments, LDC v. World Access, Inc. (In re World Access, Inc.)*, 301 B.R. 217, 276 (Bankr. N.D. Ill. 2003) (denying substantive consolidation despite inter-company transfers and claims, incorporation of the subsidiary by the parent, consolidated financial statements, administrative functions, and insurance, and common ownership, management, directors and officers); *Morse Operations, Inc. v. Robins LE-COCQ, Inc. (In re Lease-A-Fleet, Inc.)*, 141 B.R. 869, 878 (Bankr. E.D. Pa. 1992) (denying substantive consolidation notwithstanding allegations of overlapping directors, shared office space, intercompany loans, and the disregard of formalities when sharing services).

### b. Fraud or injustice has not been sufficiently alleged.

To satisfy the second alter ego element, the plaintiff must show the corporate form was misused "to perpetrate a fraud, circumvent a statute, or accomplish some other wrongful or inequitable purpose." *Sonora Diamond Corp.*, 83 Cal. App. 4th at 538. "[B]ad faith conduct on the part of the defendants" must be shown. *See Smith v. Simmons*, 638 F. Supp. 2d 1180, 1192 (E.D. Cal. 2009) (rejecting alter ego for failure to show bad faith or any fraudulent conduct in the defendant's dealings with the plaintiff); *see also Matyas v. Summerkids, Inc.*, 2022 WL 17887608, at *13 (C.D. Cal. May 16, 2022) (granting defendant's motion to dismiss claim predicated on alter ego liability because the plaintiff failed to allege some involvement by the defendant in his co-defendants' bad faith conduct).

Missing from the Complaint are any allegations of bad faith or fraudulent conduct by the Non-Debtor Defendants. For example, there are no allegations that separate entities were set up for the purpose of defrauding creditors. Nor are there any allegations that an inequitable result would occur if the Court declines to impose alter ego liability on the Non-Debtor Defendants.

DOCUMENT PREPARED ON RECYCLED PAPER

1    Rather, the Committee alleges in a conclusory fashion that treating the Debtor and Non-Debtor

2    Defendants as separate entities would allow for the Debtor's property to be placed beyond the reach

3    of Survivors, such that all of the Non-Debtor Defendants' property should be made available to

4    increase the assets available to satisfy creditor claims. (Compl. ¶¶ 2, 125, 135, 144). But that would

5    be true in every bankruptcy proceeding involving a debtor with separately incorporated affiliated

6    entities. Some wrong or abuse arising from the Non-Debtor Defendants' corporate separateness

7    must be alleged, not merely the inability to reach assets of a non-profit – one with a shared mission

8    of advancing the mission of the larger Catholic church – that might be available to satisfy creditor

9    claims.  *See Sonora Diamond Corp. v. Superior Court*, 83 Cal. App. 4th at 539 ("The alter ego

10   doctrine does not guard every unsatisfied creditor of a corporation but instead affords protection

11   where some conduct amounting to bad faith makes it inequitable for the corporate owner to hide

12   behind the corporate form. Difficulty in enforcing a judgment or collecting a debt does not satisfy

13   this standard.").

14        Moreover, according to the Amended Complaint, the Bishop had the authority to control

15   the Non-Debtor Defendants and their assets ███████████████████████████████████████

16   █████████████████████████████ and Credit Agreement. (Compl. ¶¶ 62, 112).  Even if

17   accepted as true,[15] the Amended Complaint does not allege that the Bishop *actually exercised* this

18   purported authority over the Non-Debtor Defendants to cause a past fraud or injustice. *See Reynolds

19   v. Binance Holdings, Ltd.*, 481 F. Supp. 3d 997, 1008–09 (N.D. Cal. 2020) (holding that the

20   plaintiff's alter ego liability theory must fail because he failed to allege any specific bad faith

21   conduct by the defendants that would make it equitable for them to hide behind the corporate form);

22   *Walsh v. Kindred Healthcare*, 798 F. Supp. 2d  at 1083 (holding that plaintiffs' failure to allege

23   specific facts of an abuse of the corporate form as to certain healthcare facility defendants meant

24   that the fraud or injustice element of alter ego had not been sufficiently alleged).

25        The failure to plead this element of the alter ego doctrine requires dismissal. *See, e.g., Apple

26   Inc. v. Allan & Assocs. Ltd.,*  445 F. Supp. 3d 42, 55–56 (N.D. Cal. 2020) (generalized allegations

27

28   ───────────────────────
     [15] The Non-Debtor Defendants submit that these allegations are contradicted by the text of the Offering Memorandum
     and Credit Agreement. *See supra* at p. 7.

DOCUMENT PREPARED
ON RECYCLED PAPER

1 of an injustice that would result if one of the alleged alter egos was allowed to hide behind the

2 corporate form were insufficient to satisfy the second element of the alter ego doctrine for the other

3 two defendants); *Mou v. SSC San Jose Operating Co. LP*, 415 F. Supp. 3d 918, 931 (N.D. Cal.

4 2019) (allegations that the defendants operated as a single business for the purpose of "lining their

5 pockets with money" and "evading liability" and "hiding money" deemed too vague and conclusory

6 to support a plausible inference they abused the corporate privilege).

7         *3.     The Committee Fails to Allege the Harm Posed to the Non-Debtor*

8                 *Defendants by Substantive Consolidation and How that Harm is Supposedly*

9                 *Outweighed by the Benefits of Substantive Consolidation*

10       The Amended Complaint is devoid of any allegations of the harm posed to the Non-Debtor

11 Defendants by substantive consolidation: the Committee merely alleges that the benefits of

12 substantive consolidation outweigh any harms without an explanation of what that harm may be or

13 why that is the case. (Compl. ¶¶ 125, 133, 144). As the bankruptcy court in *St. Paul* aptly

14 recognized, "[s]ubstantive consolidation does not reasonably result in the same benefit for all

15 creditors." *In re Archdiocese of St. Paul & Minneapolis*, 553 B.R. 693, 704 (Bankr. D. Minn. 2016).

16 In fact, "[c]reditors of the non-debtors who have no sexual abuse claims asserted against them

17 would not benefit from substantive consolidation as much as the creditors of non-debtors who do

18 have clergy sexual abuse claims asserted against them because those creditors do not face similar

19 risks of litigation. Substantive consolidation could dilute the recovery of creditors of non-debtors

20 who do not have clergy sexual abuse claims asserted against them." *Id.* This too supports dismissal

21 of the Committee's substantive consolidation claim.

22       B.     <u>The Court Should Dismiss the Committee's Claim for a Determination that</u>

23            <u>RCWC's Property (the School Funds) is Property of the Debtor's Bankruptcy Estate</u>

24            <u>(Count 4)</u>

25       The Committee alleges that the Debtor is the equitable owner of the School Funds because

26 it exercised control over the funds and treated them as is they belonged to the Debtor. (Compl.

27 ¶¶ 146–155). According to the Amended Complaint, the Debtor, not RCWC, entered into several

28 agreements with OPF that transferred the School Funds to OPF and authorized OPF to invest those

DOCUMENT PREPARED
ON RECYCLED PAPER

- 24 -

funds at the Debtor's direction, each without RCWC's authorization. (*See id.* ¶¶ 87–109). The Committee is incorrect.



Moreover, the Committee does not state a cognizable legal theory to support its claim for declaratory relief. Although whether an interest claimed by the debtor is "property of the estate" is a question to be decided by federal bankruptcy law, bankruptcy courts must look to state law to determine whether and to what extent the debtor has any legal or equitable interests in property as of the commencement of the case. *See Butner v. United States*, 440 U.S. 48, 54-55 (1979). Conclusory allegations of control and possession over the School Funds do not state a cognizable claim for relief, particularly where the Committee acknowledges the Debtor managed the funds on behalf of RCWC. (*See* Compl. ¶ 70). In fact, Count Four appears to be yet another attempt by the Committee to pursue an alter ego claim (a claim that does not exist as a standalone cause of action under California law),[16] substantive consolidation (which fails for the reasons described above),[17] or turnover or avoidance of an alleged fraudulent transfer (both claims which belong to the Debtor's estate that the Committee lacks standing to pursue).

---

[16] *See e.g., Int'l Petro Prods. & Additives Co. v. Black Gold S.A.R.L.*, 115 F.4th 1202, 1216 (9th Cir. 2024) (There is "no such thing" as a general alter ego claim in California).

[17] *See e.g., 21st Century Fin. Servs., LLC v. Manchester Fin. Bank*, 255 F. Supp. 3d 1012, 1029 (S.D. Cal. 2017) ("The exercise of control over an entity can serve as an indication of the 'equitable ownership' that may support imposition of alter ego liability.").

Document Prepared on Recycled Paper

# V.     CONCLUSION

For the foregoing reasons, the Non-Debtor Defendants respectfully request that their

Motion to dismiss the Amended Complaint for failure to state a claim for relief under Rule 12(b)(6)

be granted with respect to all of the claims asserted in the Amended Complaint.


Dated: May 23, 2025

REBECCA J. WINTHROP
RYAN E. MANNS (*pro hac vice*)
JAMES V. LEITO (*pro hac vice*)
JASON I. BLANCHARD (*pro hac vice*)
NORTON ROSE FULBRIGHT US LLP

By: */s/ Rebecca J. Winthrop*
          REBECCA J. WINTHROP

*Attorneys for Roman Catholic Welfare*
*Corporation of Oakland, Roman Catholic*
*Cemeteries of the Diocese of Oakland, and*
*Adventus*

DOCUMENT PREPARED
ON RECYCLED PAPER